IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


WILLIAM D. DUGGER,

       Plaintiff,

v.                                         CIV 00-1449 BB/KBM

LARRY G. MASSANARI,[1]
Commissioner of Social Security,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

      This matter is before the Court on Plaintiff's Motion to Reverse or Remand.  *Doc. 9.*
Plaintiff raises six issues – the Administrative Law Judge ("ALJ") erred by:  (1) not advising
Plaintiff he had the right to representation; (2) inaccurately applying the medical improvement
standard; (3) failing to appropriately analyze Plaintiff's pain condition; (4) improperly making the
credibility determination; (5) relying on the grids; and (6) not seeking vocational expert testimony.
Having carefully reviewed the entire record, I find merit in all but the medical improvement
contention and recommend that the motion be granted and that the matter be remanded.

### I.  Background

### A.  *Back Condition Leading To Award of Benefits In 1988*

      Plaintiff was born on October 7, 1950 and employed from 1971 through 1987 in the
construction industry, installing heating and air conditioning units.  *See Record* at 23-24, 93-94.

---

[1] On March 29, 2001, Larry G. Massanari became the Acting Commissioner of Social
Security.  In accordance with FED. R. CIV. P. 25(d)(1), Mr. Massanari is substituted for Kenneth
Apfel as the Defendant in this action.

Perhaps as early as 1983 Plaintiff began experiencing back problems and at some point he fell off of a roof.  Plaintiff saw a chiropractor and was referred to Dr. Gerald Gold, who performed back surgery in October of either 1985 or 1986.  *See id.* at 104, 117, 121, 142.  This first operation was a "lumbar laminectomy and discectomy at L5-S1," in other words a "disc excision only."  *Id.* at 104, 119.

After recuperating for three months, Plaintiff returned to work but "developed chronic low back pain."  *Id.* at 85, 104.  In September 1987, Plaintiff reported low back pain with some radiation to the right leg for a duration of "several years" with the symptoms "progressively deteriorating" around March 1987.  *Id.* at 121.  Although Plaintiff could "reach his ankles without bending his knees" and had full lateral "bending and rotation," straight leg raises caused back and thigh pain[2] and he was "uncomfortable in the seated position."  *Id.* at 121.  Plaintiff also reported that he had not engaged in any recreation "in the past few years since his back problem began." *Id.*  A magnetic resonance imaging test showed "degenerative disc with posterior bulges at L5-S1 and L4-5."  *See id.* at 104-05, 116.   His doctors also noted a "past medical history" that included "severe illnesses – esophageal ulcer."  *Id.* at 104.

Plaintiff elected to undergo a second back operation on October 9, 1987.  *Id.* at 99.  This time Dr. Gold again performed "lumbar laminectomy and discectomy," removing "scar tissue

---

[2]  Plaintiff complained of "progressive increase in low back pain . . . so much so that he says he can't stand up after bending over and he is not very comfortable at most times. . . . positive straight leg raising on the right at 80E and on the left leg he has pain more severe at 80E." *Record* at 101; *see also id.* at 104 ("It has gradually progressed in intensity so that he has considerable difficulty in making it through his day at work.  He states that 99% of his pain is located in the low back, and less than 1% is located in . . . his right thigh and calf.  At times his whole right leg will feel numb."); *id.* at 121 ("SLR in 45 degrees on left causes left lateral lumbar pain but no leg pain.  SLR on the right side to almost 80 degrees causes right posterior thigh pain but no low back pain.").

from the previous laminectomy" and the "bulging disc material." *See id.* at 99-100, 102-103.

During the same operation, Dr. Barry Maron performed "fusion surgery" by placing a series of

"pedicle" screws in one area of the spine followed by the "'Wiltzie rod system" in another area.

*See id.* at 100, 102-03, 108, 121.

All objective tests over the next several months showed the surgery successful. *See e.g.,*

*id.* at 106-07, 115, 118-19, 122. However, although Plaintiff initially reported relief, he began

complaining of severe back pain several weeks after the surgery. *See id.* at 115, 117-19. Plaintiff

filed for disability benefits on October 29, 1987, which were denied on November 16, 1987. *Id.*

at 23, 27.

As for Plaintiff's subjective complaints of pain, by December 1987, Dr. Maron noted that:

> [Dugger's] education is 11th grade. All he has ever done is heating
> and air conditioning which is heavy work. He needs vocational
> rehabilitation. He has an 18 year old child at home. Money is tight
> at the present time. I would suggest trying to get assistance
> through the Federal and State agencies at this time."

*Id.* at 119. In January 1988, Plaintiff filed a request for reconsideration of the denial of benefits,

*id.* at 29, 34, and on February 9, 1988, Dr. Maron wrote a "to whom it may concern" letter

indicating findings that would support a conclusion Plaintiff was currently "disabled," although he

expected the condition to resolve in the future. *Id.* at 117. In a medical note on February 23,

1988, Dr. Maron said he "would have to assume" that Plaintiff's complaints of subjective pain

were "a  reflex sympathetic dystrophy" and arranged "to abort that with paravertal blocks." *Id.*

at 118.

### B. Third Surgery In 1988 To Remove Screws &
### Gap In Medical Records From 1989 Through 1993

On March 9, 1988, Plaintiff was found to meet Listing 1.05.C (1) & (2) and was awarded

benefits.  *See id.* at 123.  At some point Plaintiff underwent yet a third back operation to remove

the screws and instead fuse the entire area.  *See id.* at 35, 142.  According to Plaintiff, Dr. Maron

performed the third surgery in 1988.  *Id.* at 237.[3]  Although there are no physician's notes or

records of the actual surgery, it is undisputed that at some point the screws were removed and a

complete fusion was performed.  Plaintiff then began going to FHP of New Mexico (also

apparently called the Talbert Group) in 1989 for, among other things, the problems with his back

and esophagus.  *See id.* at 35, 54, 124.

The Administrative Record does not contain Plaintiff's medical records from 1989 through

1993, evidently because the Administration only asked the Talbert Medical Group for records

going back to 1994.  *See id.* at 124.  The records available since 1994 show that while Plaintiff

had a history of problems with his back and esophagus and reported continuing pain, he did not

seek medical attention for those conditions.  Instead, he consulted a doctor for complaints of ear

and face pain, ringing in ear, and a sty in his left eye in 1994 and for chest pain in 1995.  For his

back and esophagus, Plaintiff was treating himself with over-the-counter medications – Tylenol or

Advil and Tagamet.  *See id.* at 77, 129-38, 274.

During the course of his 1996 benefits review, Plaintiff indicated that the last time he saw

---

[3]  When he went to Dr. Maron for a final checkup "still in very much pain" but Dr. Maron
said he "could not do much more" for Plaintiff and administered  "spinal blocks," which provided
relief "for a few hours, but soon the pain returned."  Plaintiff says he "kept going back to Dr.
Maron, which I felt he got to the point to where he was ignoring me.  A few months after I called
him, and was advised that he had left town."  *Record* at 41.

a doctor for his back was when he was referred to a Dr. Mital in 1991 for back pain, leg pain,

numbness and tingling of legs.  *Id.* at 36.  According to Plaintiff, Dr. Mital took x-rays and a CT

scan, found slight atrophy of the left leg and "some degree of degenerative change in the

[illegible] joints above the fusion."  *Id.* at 36, 42, 43.  Plaintiff explained that:  he was unwilling to

undergo another back surgery in 1991 given his experience in the late 1980's;  he did not seek

medical care for his back "because his condition is essentially stabilized and he continues to have

chronic pain;" and that he does not take prescription pain medication for his back because it

upsets his stomach and thus his esophagus.  *See id.* at 21-22, 43, 62, 77, 142, 274.  Plaintiff said

he "was in the process of returning to FHP for my back and leg pains . . . I will again try a

different doctor."  *Id.* at 43.

In his November 1996 report of continuing disability interview, Plaintiff indicated, "I

continue to have continuous lower back, leg and neck pain as well as migraine headaches."  *Id.* at

35.  Plaintiff reported as follows:  he could walk around the house for only 15-20 minutes per day

to attend to personal matters; he could not bend such that his wife had to help him with his socks

and shoes and getting in and out of the bathtub; he very seldom drives; and he is "still in very

much pain and discomfort, . . . unable to set for very long without changing positions or having to

stand or lay down."  *Id.* at 38-39, 41.

### C.  First Consultative Examination Result In Termination of Benefits

During his first consultative examination by Dr. Anthony Reeve in June 1997, Plaintiff

reported that "he continues to have chronic pain . . . [unable] to  function in any significant

fashion;" needs assistance to put on socks, can drive occasionally but not for long periods due to

pain; is limited to walking half an hour; and "describes the pain as sharp, it comes and goes, it is

5

aggravated by movement, alleviated by rest." *Id.* at 142. Dr. Reeve examined Plaintiff and took

x-rays. *See id.* at 47, 142. The x-rays "of the ap lateral lumbosacral spine . . . showed fusion . . .

in L4, L5, and L5, S1, complete fusion without any breakdown." *Id.* at 145. As for Plaintiff's

range of motion, Dr. Reeve found "patient had flexion/extension at the lumbosacral spine to 60E,

lateral flexion to 10E on the right and on the left. He could walk on his toes, he could walk on his

heels, he was capable of squatting approximately 15E." *Id.* at 144. He found that Plaintiff's

motor strength in "lower and upper extremities" were "5/5;" reflexes were "2+ intact;" and

"sensation intact at L4, L5, S1." *Id.*

As for Plaintiff's pain during the range of motion test, Dr. Reeves found Plaintiff "had

difficulty with pain and tenderness in the lumbosacral spine" and "straight leg raise:  Positive on

the left." *Id.*   Dr. Reeve's impressions included among other things, myofascial discomfort and

"chronic pain, failed back pain syndrome" *Id.* at 145. He found that Plaintiff's back condition

> affected his carrying capacity and he is probably not capable of
> lifting more than ten pounds or what would be considered a light to
> sedentary duty category. . . .  It is not likely that the patient would
> be able to recoup his previous ability working at a heavy duty level.
> I do not believe that occupationally he could return to a heavy duty
> level. This patient would be and excellent candidate, however, for
> vocational retraining, possibly to do something at a ***sedentary level***
> or perform something that does not require a great deal of physical
> activity. This patient's ***condition is permanent*** and ***worsening***
> condition ***will not occur, however, his condition does not have
> any significant change of improvement as well.***

*Id.* (emphasis added).

The residual functional capacity assessment soon thereafter[4] found Plaintiff capable of

---

[4] This 7/14/97 RFC was not based on an independent examination and the physician's
signature is illegible but presumably Dr. Aida Recalde's. *See Record* at 146, 154, 186.

6

occasionally lifting 20 pounds, regularly lifting 10 pounds; standing or walking 6 hours a day; sitting 6 hours a day; pushing/pulling unlimited; and occasional stooping.  *Id.* at 147-54.  On July 23, 1997, Plaintiff was notified that his benefits would cease.  *See id.* at 47-48, 184.

### D.  Second X-Ray and Consultative Examination

In September 1997, Dr. Kanyinda Mpoy of the Talbert Medical Group referred Plaintiff for a back x-ray and to Dr. Joseph Alcorn for evaluation of his longstanding esophogeal problems. The x-ray and exam were conducted on September 9, 1997, the same day that Plaintiff filed a request for reconsideration saying he is in "constant pain with my back, neck and esophagus," suffers from migraine headaches, and reported the pain as very strong, requiring him to "lay down."  *Id.* at 51, 53.

As with the June x-ray, the September x-ray showed Plaintiff's lumbar spine and cervical spine were normal.  *Id.* at 168.   Ten days after the x-ray, Plaintiff's wife called the Talbert Group to relate that Plaintiff is "still in pain" and the notes state " will refer to ortho."  *Id.* at 167. However, Plaintiff never followed up with an orthopedic doctor.

In April 1998, Plaintiff was seen a second time by Dr. Reeve.  He noted Plaintiff is "also complaining now of neck pain . . . sharp and it is fairly constant . . . headaches associated with his cervical neck pain. . . . [and ] pain in his low back remains constant.  It is aggravated by walking, bending and twisting."  *Id.* at 169.  Dr. Reeve performed a second range of motion test finding: Plaintiff had a "full" range of motion in the "cervical neck;" could flex his back to 60̊, extend to 20,̊ and rotate to 20̊; "positive straight leg raise on the right;" "multiple tender spots noted in the L4-5 distribution;"  motor strength "5/5;" sensation "intact;" and  reflexes "2+."  *Id.* at 171. Dr. Reeve's impressions were:  "DJD of the cervical spine;" "chronic pain disorder"; and

"medically stable." *Id.* For rehabilitation management, Dr. Reeve again concluded Plaintiff cannot return to previous heavy work, is probably not capable of lifting more than 10 lbs frequently and "has minor findings in the cervical spine that do not significantly contribute to his condition." In Dr. Reeve's opinion, Plaintiff's cervical spine "at this time is not disabled in any fashion. He has normal degenerative processing which occurs with age. His category in terms of work [sedentary] has not change[d]." *Id.*

This time Dr. Reeve also filled out functional capacity assessment. He found Plaintiff could occasionally lift 10 pounds. *Id.* at 172. His findings are not explained in detail, although he clearly intended to indicate significant limitations. Dr. Reeve wrote that Plaintiff is only able to walk/stand only "2 hours with interruptions," although he checked that this category is not affected by Plaintiff's back problems (which would otherwise indicate Plaintiff could stand and/or walk 8 hours a day). *Id.* In contrast, he checked that sitting is affected by Plaintiff's back impairment and noted that Plaintiff ***could only sit a total of 2 hours in an 8-hour day and only 30 minutes without interruption.*** *Id.* at 173 (emphasis added).

A second "advisory" residual functional capacity form was filled out by Dr. Melvin Golish soon thereafter. Dr. Golish, who did not examine Plaintiff, disagrees with Dr. Reeve in how long Plaintiff can stand, walk, and sit. Dr. Golish found Plaintiff can lift 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours out of an 8-hour workday; sit 6 hours in an 8-hour workday, and push/pull unlimited. *Id.* at 177.

### E.  Esophagus and Kidney Problems/Plaintiff's Pro Se Pursuit of Disability Finding

Meanwhile, beginning in September 1997, Dr. Alcorn evaluated Plaintiff's esophageal problems. Dr. Alcorn noted that Plaintiff took Pepcid for his heartburn, had just switched to

Prevacid, and occasionally takes propoxyphene[5] for his low back pain.  *Id.* at 158.   After dilating

Plaintiff's esophagus and performing an endoscopy, Dr. Alcorn diagnosed Plaintiff with "distal

esophageal disease with stricture" and recommended surgery.  *See id.* at 155-56, 159, 160, 162,

166.  In July, Plaintiff learned the disability hearing officer found him not disabled and in August,

Plaintiff requested that his benefits be continued and a hearing before an ALJ.  *See id.* at 65-73,

76-82.

      In the fall of 1998, Plaintiffs esophageal condition was still being evaluated for surgery and

he was also complaining of abdominal pain and bloating.  *See id.* at 195, 228, 230.  The doctors

discovered a cancerous tumor on one of Plaintiff's kidneys and the kidney was removed in

October.  *See id.* at 185, 191-94, 196-98, 199-226.  This put Dr. Alcorn's plans to operate on

Plaintiff's esophagus "on the back burner."  *Id.* at 189.

      The ALJ held a short hearing in May 1999, which Plaintiff attended *pro se.  Id.* at 16.  He

issued a decision finding that Plaintiff no longer met Listing 1.05.C, Plaintiff's subjective

complaints and functional limitations are exaggerated, and Plaintiff is capable of light work.  The

ALJ then applied the grids without the testimony of a vocational expert.  *Id.* at 11-13.  Plaintiff

proceeding *pro* se requested review.  *Id.* at 6.  The Appeals Council denied review on August 22,

1999.  *Id.* at 4.  This suit followed, where Plaintiff  for the first time is represented by counsel.

*Doc. 1.*

---

    [5]  "Propoxyphene hydrochloride" is defined as an "orally effective analgesic structurally related to methadone and used for the relief of mid to moderate pain; it is less effective than codeine but with less liability for abuse."  *Stedman's Medical Dictionary,* 25th ed.

## II.  Analysis

### A.  No Showing That ALJ Advised Plaintiff Of Right To Counsel Prior To The Hearing

The ALJ's decision notes that Plaintiff "appeared without a representative, having been advised of his right to representation."  *Id.* at 11.  Nothing in the transcript of the hearing or the record, however, establishes that the ALJ advised Plaintiff of his right to representation and elicited a waiver of that right before the hearing.  Plaintiff asserts that he was not advised of his right to counsel by the ALJ before the hearing.

I do not find the ALJ's comment about advisement conclusive because it is ambiguous.  The comment can mean the ALJ advised Plaintiff and secured a waiver before the tape began *as well as* mean Plaintiff received notification prior to the hearing through written form documents.[6]  Defendant contends that written notices alone are sufficient.  Plaintiff contends that advisement on the record is also required to demonstrate a voluntary and intelligent waiver and, when failure to do so results in prejudice to a claimant, a remand for a new hearing is warranted.

An early Tenth Circuit decision supports Defendant's contention.  In *Garcia v. Califano,* 625 F.2d 345 (10th Cir. 1980), the Court held "that the hearing examiner was not required at the hearing to advise [claimant] of his right to be represented by an attorney."  Because "[n]either the statute nor the regulations expressly provide that the hearing examiner shall advise the claimant at

---

[6]   The record shows that before the hearing Plaintiff received several notices of his right to representation, and at the disability officer stage elected to proceed without a representative.  *See Record* at 47-49 (7/23/97 notification that benefits will be terminated); *id.* at 51 (9/11/97 request for reconsideration where Plaintiff selected "I do not wish to appear nor do I wish a representative to appear for me at the disability hearing"); *id.* at 73-75 (7/2/98 notification of hearing decision terminating benefits; advising Plaintiff of steps for appeal to ALJ); *id.* at 83-84 (9/25/98 acknowledgment of Plaintiff's request for hearing before ALJ); *id.* at 14-15 (5/4/99 notice of setting hearing).

the hearing of his right to representation by an attorney," the regulations at the time were found to give the ALJ the "discretion" to determine how to conduct a "fair hearing." *Id.* at 356.  In contrast, the current regulations do require written notice of the type Plaintiff received.  While they do not specifically require advisement at the hearing, they also no longer refer to the discretion that was key to the *Garcia* decision.  *See e.g.,* 20 C.F.R. §§ 404.929, 404.946 - 404.952, 404.1706.[7]

More recent decisions from the Tenth Circuit provide that in addition to written notice required by the regulations, advisement before the hearing is also necessary:

> Ms. Carter argues that the ALJ failed to advise her adequately of her right to counsel.  The ***record reveals,*** however, that the ALJ did advise Ms. Carter of her right to counsel prior to the hearing, and that she waived that right. . . .  The notice of hearing, notice of denial, and notice of reconsideration sent to Ms. Carter ***also*** advised her of her right to representation. . . .  While the customary and better practice would seem to be to place both the advisement and the waiver on the record during the hearing, neither the pertinent statute, *see* 42 U.S.C. § § 406(c), nor the regulations, *see* 20 C.F.R. § 404.1706, nor our previous cases require any more advisement than was given in this case.  *See Garcia v. Califano.*

*Carter v. Chater,* 73 F.3d 1019, 1021 (10th Cir. 1996).  Later unpublished Tenth Circuit decisions do not definitively determine how extensive the advisement must be and do not decide burden shifting issues.  Those decisions do, however, underscore *Carter* stands for the proposition that, in addition to the standard written notices, a showing of advisement on or off the record and a

---

[7]  The regulation Plaintiff relies on only requires the written notification that Plaintiff received.  *See* 20 C.F.R. § 404.1706.  Defendant cites no other regulations in support of its position.

valid waiver of counsel is necessary.[8]  There is no such showing here.[9]

---

[8]  *See Johnson v. Apfel,* 229 F.3d 1163, 2000 WL 1346214 (10th Cir. 2000) (claimant received written notices advising of right to assistance of lawyer and fee arrangements advised on the record of ability to "go to Legal Aid" and fee arrangements and asked if claimant still wanted to proceed; declined to expand *Carter* to require ALJ "to explain the advantages of proceeding with counsel" or dissuade claimant from notion that proceeding with a lawyer is a "bad idea"); *Lee v. Callahan,* 124 F.3d 217, 1997 WL 527614 (10th Cir. 1997) (claimant argued she was denied right to counsel because she was "unable to obtain an attorney;" held that because "record reflects that claimant was advised of her right to be represented by counsel at the hearing, and she waived that right. . . . The advisement satisfied the agency's duty" citing *Carter*); *Merriman v. Chater,* 82 F.3d 426, 1996 WL 173152 (10th Cir. 1996) (noting other circuits hold that ALJ "must explain the role of counsel in greater detail to a mentally impaired claimant" and hold that if the "ALJ does not obtain a valid waiver of counsel, which was not done here, then the burden is on the Secretary to show that the ALJ adequately developed the record [and then] claimant has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap" but not deciding the issues).

[9]  Defendant cites *Simmons v. Chater,* 950 F. Supp. 1501 (N.D. Okla. 1997) for the proposition that only written notice is required.  However, that decision dealt only with lack of written notice of a right to an attorney in the context of post-hearing proceedings and specifically:

> additionally note[d] that the transcript of the hearing before the ALJ indicates that **when the ALJ informed Plaintiff of her right to representation she expressed a desire to proceed with an attorney.** However, the hearing continued without interruption, and with Plaintiff unrepresented. . . . Generally, absent compelling circumstances, courts do not inquire into issues which are not raised before the court. . . .  And, as noted, Plaintiff does not raise this issue. In addition, Plaintiff notes in her brief that she choose to forego the right to an attorney during the initial hearing. . . . Finally, the absence of counsel is not sufficient reason alone to justify a remand.  *See, e.g., Vidal v. Harris,* 637 F.2d 710, 713 (9th Cir.1981) . . .  The Court is satisfied, after a review of the record, that Plaintiff's lack of counsel at the hearing did not prejudice her case.

*Id.* at 1501 n.15 (emphasis added; certain reference material omitted).  Defendant also cites a case at 5 F.3d 476, 479-80 (10th Cir. 1993), which is captioned *Baca v. Department of Health & Human Servs.* and not "*Garcia v. HHS*" as appears in Defendant's brief.  *Baca* does not discuss the issue of notice.  In fact, at those pages *Baca* discusses the ALJ's duty to develop the record even if a claimant has counsel.  The Court cannot locate a *Garcia* social security decision on the advisement issue.

Nevertheless, failure to advise and secure a valid waiver does not automatically result in a remand. Instead, the *Merriman* and *Simmons* decisions cited in previous footnotes follow the Ninth Circuit's decision in *Vidal v. Harris,* 637 F.2d 710 (9th Cir. 1981). They hold that a remand is not necessary if after reviewing the record, the Court is satisfied the ALJ "fully and fairly" developed the record and there is "no prejudice." For the reasons discussed below, as for the finding that Plaintiff "medically improved" because he no longer meets Listing 1.05C, the record was fully and fairly developed and resulted in no prejudice. However, as for the ALJ's credibility, residual functional capacity, and grid determinations, the record was either not fully and fairly developed or not based on substantial evidence.

### B. Substantial Evidence Supports Conclusion Plaintiff "Medically Improved" Because He No Longer Meets Listing 1.05C

"In order to terminate benefits, ***the Secretary must prove*** . . . that the claimant's medical condition has improved, that the improvement is related to a claimant's ability to work, and that the claimant is currently able to engage in substantial gainful activity. 20 C.F.R. § 404.1594(a)." *Houston v. Chater,* 56 F.3d 77, 1995 WL 324503 (10th Cir. 1995) (unpublished) (emphasis added and citation omitted); *see also Glenn v. Shalala,* 21 F.3d 983, 987 (10th Cir. 1994); *Mables v. Sullivan,* 812 F.Supp. 886, 888 (C.D. Ill. 1993) (noting under *Mathews v. Eldridge,* 424 U.S. 319, 336 (1976) and the Conference Agreement on the Standard of Review for 42 U.S.C. § 423(f), in either initial or continuing proceedings claimant bears burden of showing disability, however, claimant's burden was eliminated in medical improvement cases).

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton*

*v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992).  My assessment

is based on a review of the entire record, where I can neither reweigh the evidence nor substitute

my judgment for that of the agency.  *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d

799, 800 (10th Cir. 1991).  "Substantial evidence" means "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  *Castellano v. Sec'y of Health & Human*

*Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted).

Substantial evidence supports ALJ's conclusion that Plaintiff's back condition improved

and that the improvement is related to his ability to work.  Listing 1.05.C provides:

> Other vertebrogenic disorders (e.g., herniated nucleus puplosus,
> spinal stenosis) with the following persisting for at least 3 months
> despite prescribed therapy and expected to last 12 months.  With
> both 1 and 2:
> > 1.  Pain, muscle spasm, and significant limitation of motion
> > in the spine; and
> > 2.  Appropriate radicular distribution of significant motor
> > loss with muscle weakness and sensory and reflex loss.

In 1988, Plaintiff was found to meet this listing on the basis of Dr. Maron's February letter, which

noted pain, muscle spasm, significant limitation of motion, muscle weakness, and sensory and

reflex deficits.[10]  The ALJ applied the correct legal standard by comparing the 1998 medical

---

[10]  The letter provided:

> The above patient is under my care and suffers from a vertebral
> disorder which has persisted for more than several years.  The
> problem has been existing despite therapy, medications and
> supportive care.  The treatment has been tried for greater than
> twelve months starting at least in 1983 and stopping with the
> surgery performed on October 9, 1987.  On objective testing he has
> been shown to have stress *elicited pain when the sciatic nerve is*
> *stressed*.  He has *objective muscle spasm* and *currently significant*
> *limitation of motion in spinal movement* secondary to his injury
> and operative treatments.  He does have some *muscle weakness in*

evidence to Plaintiff's current condition.  *See Byron v. Heckler,* 742 F.2d 1232, 1236 (10th Cir.

1984) ("The Appeals Council focused only on current evidence of whether appellant was disabled.

In order for evidence of improvement to be present, there must also be an evaluation of the

medical evidence for the original finding of disability.  'Without such a comparison, no adequate

finding of improvement could be rendered.' . . .  This failure to apply the correct legal standard is,

by itself, sufficient to command reversal in the case.").  The ALJ's finding that the current medical

evidence showed Plaintiff "has no muscle spasm, his reflexes are intact, sensation is intact in the

L4, L5 and S1 dermatomes, and his motor strength is rated 5/5, " *Record* at 12, is supported by

the June and September x-rays and Dr. Reeve's examination of Plaintiff, *id.* at 144-45.

The ALJ also concluded that a comparison of the medical evidence concerning Plaintiff's

back constituted "medical improvement."  *Id.* at 12.  Plaintiff argues that the ALJ did not apply

the correct medical improvement standard because he did not base it on comparison of residual

functional capacity under 20 C.F.R. § 404.1594(c)(2).  However, that regulation is inapplicable

because the original disability determination was based on meeting Listing 1.05C without any

residual functional capacity finding.  Under 20 C.F.R. § 404.1594(c)(3)(i) where a

> [p]revious impairment met or equalled listings . . . an assessment of
> [the claimant's] residual functional capacity would not have been
> made.  ***If medical improvement has occurred*** and the severity of
> the prior impairment(s) ***no longer meets or equals the same listing
> section*** used to make our most recent favorable decision, ***we will
> find that the medical improvement was related to your ability to
> work***. . . .  We must, or course, also establish that you can currently
> engage in gainful activity before a finding that your disability has

---

> ***the lower extremity and sensory and reflex deficits.***  Some of this
> will resolve with time.

*Record* at 117 (emphasis added); *see also id.* at 11-12.

15

ended.

*Id.* (emphasis added).

In his reply, counsel for Plaintiff alludes to the possibility that additional medical records exist yet he does not contend in any pleading that Plaintiff continues to meet Listing 1.05C. Instead, his arguments only go to the final issue that the Secretary must show before terminating benefits – residual functional capacity or Plaintiff's current ability to engage in substantial gainful activity.  Thus, the ALJ's decision concerning medical improvement relating to ability to work is not erroneous.

### C.  Record Concerning Plaintiff's Subjective Complaints Of Pain And Functional Limitations Was Not Fully Developed

An inability to work entirely pain free is not sufficient reason to find a claimant disabled. *Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir. 1988).  Where, as here, a claimant suffers from a back impairment and esophageal problems that can produce pain, in evaluating a claimant's assertions of pain the ALJ must consider:  level of medication used; effectiveness of the medication; the claimant's attempts to obtain relief; frequency of medical contacts; nature of daily activities; credibility; and the consistency or compatibility of nonmedical testimony with objective medical evidence.  *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995).  "Credibility determinations are peculiarly the province of the finder of fact, and [this court]  will not upset such determinations when supported by substantial evidence."  *Diaz v. Sec'y of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir.1990).  There are a number of reasons why the ALJ's determination that Plaintiff has the residual functional capacity for light work is insufficient under these standards.

First, the ALJ's discussion appears to take the *Kepler* factors into account but does so only in a cursory manner.  It is not sufficient to merely list the factors, an ALJ must also "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible."  *Kepler,* 68 F.3d at 391.

Second, in reaching his conclusion the ALJ discounted Plaintiff's testimony of subjective complaints and functional limitations as exaggerated.  *Record* at 12.  However, there was no **testimony** at the hearing on this point.  At least half of the short hearing before the ALJ consisted of describing how Plaintiff felt after his kidney surgery, the problems with his esophagus, and what plans were contemplated for following up with treatment of his esophagus.  In response to the ALJ's question as to what Plaintiff does during the day, Plaintiff responded, "I do just as much as I can around the house, helping the wife" and went on to describe his back surgery, his pain, and medication. This constitutes the entire hearing.  The ALJ did not elicit any specific information from Plaintiff about his functional limitations or daily activities.  *See id.* at 18-22.

Construing the ALJ's analysis liberally, he concluded that Plaintiff exaggerates his pain because Plaintiff quit seeking medical treatment for his back and only medicates with Tylenol or Advil and "Hydrocod for pain as needed."  Because he was found to exaggerate pain, the ALJ discounted and did not discuss any of Plaintiff's assertions of exertional limitations save for putting on his shoes.[11]

---

[11]  The paragraph on pain and credibility provides in pertinent part:

> The claimant's testimony of subjective complaints and functional limitations, including pain, was not entirely supported by the evidence as a whole to the disabling degree alleged.  The claimant complaints of severe pain, which prevents him from performing any significant activities.  He has pain-producing impairments, but

One problem with this logic is that it is based on the assumption Plaintiff occasionally takes a prescription medication for his back. The record shows, however, that the Hydrocod was taken post-operatively for the pain resulting from his kidney removal.  There is also evidence in the record showing that Plaintiff found spinal block therapy did not give him permanent relief and that he discontinued seeing doctors for his back because they prescribed a fourth surgery, which Plaintiff is unwilling to undergo.  Moreover, Dr. Reeve found Plaintiff had same kind of pain as he had prior to his operation in 1988 – pain in the lumbar area and "positive" results when a leg is lifted.  Dr. Reeve noted Plaintiff's condition as "permanent and worsening will not occur, however his condition does not have any significant change of improvement as well."  *Id.* at 145. Dr. Alcorn's reference to "occasional" use of Propoxyphene for back pain, does not indicate why the use of this prescription drug is occasional.  *Id.* at 158.

Another problem is that credibility assessments require consideration of all the factors "in combination."  *Huston v. Bowen,* 838 F.2d 1125, 1132 n. 7 (10th Cir. 1988).  As the ALJ noted, Plaintiff says he does not take prescription pain medication because of its effect on his esophageal problems.  Moreover, the record demonstrates that at the time of the hearing further treatment for

---

exaggerates the degree of pain he experiences.  He testified that his main problem was still his back.  He says that he gets bad headaches and double vision form the pain.  He has not sought additional medical treatment for these complaints.  His [back] pain is aggravated by movement and alleviated by rest (Exh. 25).  He says that his pain medication aggravates his esophageal problems. He uses over-the counter Advil and prescription Hydrocod for pain as needed (Exh. 40).  He told the consultative examiner that he took only Tylenol. (Ex. 32).  He is able to drive and perform light household chores, but occasionally has difficulty putting on his shoes.

*Record* at 12.

the esophageal problems was delayed to deal with the cancerous kidney and Plaintiff found other interventions short of surgery ineffective.   Yet the ALJ merely recites but does not consider or discuss the inability to take prescription pain into account in assessing Plaintiff's allegations of pain.

The ALJ also found while it is difficult for Plaintiff to put on his shoes, he can "drive and perform light household chores."   However, Dr. Reeve noted that Plaintiff "can drive occasionally **but not for long periods due to pain,**" *id.* at 142 (emphasis added), a limitation the ALJ does not acknowledge.  Even absent Dr. Reeve's note, "the ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain."  *Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir. 1993) (citing *Frey v. Bowen,* 816 F.2d 508, 516 (10th Cir. 1987)).  Thus, I find the ALJ did not fully develop the record and that the credibility determination is not supported by substantial evidence.

Third, the degree of pain Plaintiff experiences is integrally linked to his functional limitations.  Light work requires, among other things, "a good deal of or standing, or . . . *sitting most of the time*. . . .  If someone can do light work . . . he or she can also do sedentary work, unless there are additional limiting factors *such as . . . inability to sit for long periods of time* with some pushing and pulling of arm or leg controls."  20 C.F.R. 404.1567(b) (emphasis added).  Plaintiff reported to the agency that he is unable to sit "for very long without changing positions or having to stand or lay down."  *Id.* at 41.  Dr. Reeve mentioned limitations in how long Plaintiff can drive and specifically found Plaintiff's ability to sit is impaired such that he can only sit 2 hours of an 8-hour day and only 30 minutes without interruption.  *Id.* at 173.

The ALJ notes Dr. Reeve's sitting limitations, but discredits them on the ground that Dr.

Reeve "previously indicated that [Plaintiff could perform light work . . . specifically . . . lift 10 pounds frequently and could stand and walk for an entire 8 hours, with normal breaks." *Id.* at 12. This mischaracterizes Dr. Reeve's reports, which limit Plaintiff to sedentary work, and wholly ignores his findings on limitations on sitting.  It constitutes error:

> To reach this conclusion, the ALJ had to ignore evidence in the record which conflicted with his conclusion.  This he may not do. *See Switzer v. Heckler,* 742 F.2d 382, 385-86 (7th Cir. 1984) (Secretary's attempt to use only portions of report  "favorable to her position, while ignoring other parts , is improper"); *Smith v. Bowen,* 687 F. Supp. 902, 904 (S.D.N.Y. 1988) ("Although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, he cannot pick and choose evidence that supports a particular conclusion." (citation omitted)).

*Udero v. Apfel,* 156 F.3d 1245 (10th Cir. 1998) (unpublished).  Moreover, the first residual functional capacity determination as well as Dr. Golish's limit Plaintiff's ability to sit/stand/walk to six hours of an eight-hour day.  Dr. Reeve's assessment limits these abilities significantly further. Indeed, the ALJ found that Plaintiff's back pain is aggravated by movement.  These restrictions are relevant to the ability to perform light work but were not considered by the ALJ.

> Alternate sitting, standing, or walking by implication precludes the kind of extensive sitting, standing and walking contemplated by the definition of light activity.  To elaborate, being able to sit, stand, or walk alternately for only six hours collectively would seem to impose significant restrictions on ability to perform light work, since light work by definition is work that "requires a good deal of walking or standing, or . . . involves sitting most of the time with some pushing and pulling of arm or leg controls."

*Talbot v. Heckler,* 814 F.2d 1456, 1463 (10th Cir. 1987); *see also Ragland v. Shalala,* 992 F.2d 1056, 1059 (10th Cir. 1993).

Finally, the ALJ applied the grids to find Plaintiff not disabled without resort to vocational

expert testimony.  This, too, was erroneous because the sitting limitations do not exactly match

the residual functional capacity for that category.  The grids cannot be applied conclusively unless

all of Plaintiff's characteristics, including residual functional capacity, "precisely match" a

particular grid.  *E.g., Gossett v. Bowen,* 862 F.2d 802, 806 (10th Cir. 1988).  In addition,

"sporadic performance [of household tasks or work] does not establish that a person is capable of

engaging in substantial gainful activity."  *Thompson,* 987 F.2d at 1490 (internal quotations and

citations omitted).

   Wherefore,

   **IT IS HEREBY RECOMMENDED THAT** the motion to remand be granted and the

matter be remanded for further proceedings.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF**

**SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file

written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A**

**party must file any objections with the Clerk of the District Court within the ten day**

**period  if that party wants to have appellate review of the proposed findings and**

**recommended disposition.  If no objections are filed, no appellate review will be allowed.**

UNITED STATES MAGISTRATE JUDGE